1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

Protego Holdings Corporation, a Washington
Corporation;

      v.

Blackie Capital, Inc., a Corporation; Nathan
Barron, an individual; Michael Mulhall, an
individual; Blackie Capital Global Family
Trust Company; Michael Barron, an
individual; Theresa Barron, an individual;
Yoseph Elkaim, an individual; Akerman Law
Firm, a Professional Corporation; Sherri R.
Scheffer, an individual; Sherri R. Scheffer,
CPA, PLLC; Arthur W. Wood Company, Inc.;
Egan Jones Rating Company, a Corporation,
and John Does 1-10.

NO.: _____

JURY TRIAL DEMANDED

## **COMPLAINT**

1

COMPLAINT
CASE NO.

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
P: 909.557.1258| F: 909.557.1275

## ALLEGATIONS

1.    This action arises from a transaction that occurred in January 2023 between Plaintiff Protego Holdings Corporation and Defendant Blackie Capital, Inc. As a result of that transaction, Blackie obligated itself to provide Protego with a $200 million investment, which Protego intended to use to build out the infrastructure for a nationally chartered trust bank. However, Blackie failed to fund its obligation. Then, as time passed, Blackie executives repeatedly offered specific promises affirming Blackie's ability and intention to meet its obligation to Protego, often supported by comfort and goodwill letters from third party Defendants that funding was imminent. Still, Blackie failed to provide the promised funding despite these repeated promises. And now, Blackie has not bothered to communicate with Protego in the last four months, despite two years of unfulfilled promises.

2.    Because of Blackie's wrongful acts, Protego has lost significant amounts of time, resources, and opportunity. It has lost nearly $100 million already invested in the project. It has lost the hard-won, extremely rare, and valuable conditional approval it won from the national financial regulators at the Office of the Comptroller of the Currency ("OCC") in 2021, when Protego's subsidiary, Protego Trust Bank N.A., became one of only three conditionally approved national banks focused on digital assets. It has been forced to lay off employees and default on its obligations to third parties assisting it in the creation of vital infrastructure.

3.    Blackie's delays have also prevented Protego from taking advantage of market conditions growing more favorable by the day—the value of cryptocurrencies has rallied to all-time highs in the wake of Donald J. Trump's election to the presidency, increasing the valuations of entities, like Protego, who propose to provide key parts of the cryptocurrency and financial services infrastructure.  Time is also money: Blackie's non-performance has resulted in Protego losing its "first mover advantage," losing multiple years in time to market, and allowing competitors to gain market share that would otherwise have belonged to Protego. Blackie's delays have also manifested in higher interest rates to borrow and longer repayment times, longer

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

turnaround times for necessary projects, and vendors not being repaid, or being repaid only from whatever cash flow Protego can muster as a start-up entity.

4.      When Blackie and its executives met with Protego in 2022, it presented itself as a sophisticated investor with significant experience in the kind of investment posed here by Protego. Thus, Blackie was aware—or at least it represented that it was aware—of the importance of delivering on the promised funding. Instead, Blackie's failure to satisfy the requirements of the Note Purchase Agreement (defined below) has damaged Protego in an amount dwarfing even Blackie's original $200 million commitment. With little option but to seek recourse for these damages, Protego has filed this civil action against Blackie, and the entities that facilitated Blackie's wrongful acts.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332(a) because Plaintiff and Defendants are citizens of different States and the amount in controversy exceeds the sum or value of $75,000.

6.       Venue is proper in this judicial district because it is where a substantial part of the events or omissions giving rise to Protego's claims occurred. See 28 U.S.C. § 1391(b).

7.      The Court may exercise personal jurisdiction over Defendant Blackie Capital because it transacted business within the State of Washington—specifically, with Protego—and this action arises out of that business. Blackie and Protego entered into various agreements, the terms of which are more fully set forth below and attached to the Complaint (the "Agreements"). The Agreements were entered into in Washington and contemplate Protego's performance in Washington because Protego has its principal place of business in this District.

8.      Based on information and belief, each of the other facilitating Defendants are subject to this Court's jurisdiction as they conducted business with Blackie with the understanding that their representations, actions or services would be used by Blackie to support their investments throughout the United States, including in the State of Washington and this District.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

**PARTIES**

9.      Protego Holdings Corporation is a Washington corporation authorized to conduct business in the State of Washington. At all times relevant to this action, Protego maintained its principal office at 5608 17th Ave. NW # 905 Seattle, WA 98107-5232.

10.      Defendant Blackie Capital Inc. is corporation, with its principal place of business located in Frisco, Texas. Blackie's principals, including but not limited to Nathan Barron, Mark Urbina, and Michael Mulhall, made misrepresentations to Protego on Blackie's behalf and entered into the Note Purchase Agreement.

11.      Defendant Nathan Barron is an individual believed to be residing in the State of Texas. Nathan Barron purports to be the CEO of Blackie Capital and engaged in communications with Protego both before and after Blackie entered into the Note Purchase Agreement with Protego.

12.      Defendant Michael Mulhall is an individual residing in the State of Virginia. Michael Mulhall purports to be the President and COO of Blackie Capital. He also engaged in communications with Protego before and after Blackie entered into the Note Purchase Agreement.

13.      Defendant Mark Urbina is a resident in the state of Florida purports to be the Vice Chairman of Blackie Capital, and a "Senior Procurement Officer" in the apparently related Barron Capital Corp. He also engaged in communications with Protego before and after Blackie entered into the Note Purchase Agreement.

14.      Blackie Capital Global Family Trust Company, exact entity unknown, is believed to be created in the State of Nevada. Michael and Theresa Barron are the parents of Nathan Barron and, purportedly, directors and/or officers in both Blackie Capital Global Family Trust Company and Blackie Capital.

15.      Defendant Yoseph Elkaim is an individual residing in the State of Texas. Elkaim purports to be the Chief Compliance Officer and Diligence Team for Blackie Capital, and in that

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

capacity took actions to perpetrate and facilitate the breach of contract, fraud and misrepresentations by Blackie Capital.

16.     Defendant Akerman LLP is a limited liability partnership formed in the State of Florida, with its principal place of business in Miami, Florida, with offices throughout the United States, where it is believed to serve clients throughout the United States including in the State of Washington.

17.     Defendant Sherri Scheffer is an individual residing in the State of Texas and Sherri R. Scheffer, CPA, PLLC, is believed to be a professional corporation based in Houston, Texas.

18.     Defendant Arthur W. Wood Company, Inc. is believed to be a full service financial brokerage company located in the State of Massachusetts.

19.     Defendant Egan-Jones Ratings Company is believed to provide credit ratings and research of financial institution, broker, dealer and private placement and is headquartered in the State of Pennsylvania.

20.     The true names and capacities of the Defendants sued herein as DOES 1 through 10, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names. Each of the Defendants designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein. Plaintiffs will seek leave of Court to amend this Complaint to reflect the true names and capacities of the Defendant designated herein as DOES when such identities become known.

21.     Based upon information and belief, Plaintiffs alleges that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants. In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendant.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

**FACTUAL ALLEGATIONS**

22.     As technology and finance continue to merge and create additional financial opportunities for America and the world, the universal truth remains that economic transactions must be built on trust. Even in the realm of cryptocurrency, which was conceived with the notion that cryptographic proof could minimize or eliminate the need for systemic trust, it turns out that such trust is required at numerous points in a complex economic system.

23.     For example, one must trust the underlying currency's core developers. One must also trust those that keep track of bitcoin transactions. In theory, all transactions are trackable from a single bitcoin's mining through a theoretically endless set of transactions. But in practice, few realistically have the time or resources to confirm that such transactions are being kept correctly. Moreover, anonymity and transactional delay end up adding risk to cryptocurrency transactions as well.[1]

24.     And yet a third issue is where to store cryptocurrency: where does one keep a currency that only exists as code? Or more specifically, where does one keep the cryptographic keys that provide access to the cryptocurrencies which, for all practical purposes, never actually leave the blockchain on which they reside? One can keep cryptocurrency with a third-party entity, but that raises questions of security and fiduciary trust—will the currency be stored safely, and is it being stored with an entity that will not abuse its trust? Banks in the United States have earned a societal level of trust on these issues after centuries of storing government-backed currencies and because they are monitored, overseen and examined by government agencies at both the state and federal level. This oversight provides additional layers of security and certainty for clients. This type of regulatory oversight is essential, especially for institutional clients (i.e. large entities whose accounts are often in the millions or billions of dollars of assets)

---

[1] One observer has commented that it is impossible to facilitate an exchange of physical goods with blockchain reliant currency without "either relying on third parties or enabling at least one side to extort the other."

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

1  who often have their own regulatory requirements regarding where and how they may custody

2  their assets .

3      25.    Unlocking the promise of cryptocurrency requires solving these problems, often

4  from scratch, given the novel and unique challenges cryptocurrency has introduced into the

5  global financial system. By obtaining a state banking charter, and the conditional approval to

6  convert that state bank to a national bank, Protego had positioned itself, through years of hard

7  and expensive work, to be at the epicenter of the adoption of cryptocurrencies and digital assets.

8      26.    Unfortunately, in systems that are built on trust, one also finds actors willing to

9  abuse that trust for personal gain. In just in the past two years, alternative financial markets have

10  been rocked by multiple revelations of mistrust and misdealing, culminating in the collapse of

11  cryptocurrency exchange FTX and its former executives. While the causes and effects of the

12  FTX collapse will be debated for many years to come, it is undisputed that cryptocurrency

13  markets took a massive hit from regulators and investors alike, driving cryptocurrency values

14  down and chilling transactions as individuals lost trust in the system.

15      27.    Emerging from the wreckage of the crypto collapse, however, is a generation of

16  dedicated investors who have learned the lessons of prior collapse and, from them, build

17  stronger, more trustworthy cryptocurrency markets. Protego aspires to be one of these players in

18  the industry. And, in 2021, it became one of only three entities to receive preliminary approval to

19  function as a bank able to accept the deposit and withdrawal of cryptocurrencies such as Bitcoin

20  and Ethereum.[2]

21      28.    Protego registered this achievement—even as crypto markets were inviting

22  extraordinary skepticism from both regulators and investors—because it has invested significant

23  time and resources planning for the challenges and pitfalls of managing third-party crypto

24

25

26  [2] The opportunity for a startup offering the kind of services and expertise Protego has proposed
is lucrative. One of the other three banks that received preliminary approval around the same

27  time as Protego conducted a subsequent funding round valuing that business at over $2 billion.

COMPLAINT
CASE NO.                                Law Offices of Ari Brown, PLLC          MCCUNE LAW GROUP
                                        3909 47th Avenue South          18565 Jamboree Road, Ste. 550
                                        Seattle, WA 98118                    Irvine, CA 92612
                                        T: 206. 412.9320                   T: 909.557.1250

resources under the supervisor of U.S. financial institution regulators, and has plans for the bank's security, accounting, and tracking of assets.

29.    In particular, Protego plans to provide cryptocurrency custody services in a fiduciary capacity for institutional clients by resolving their storage concerns and providing a safe storage for holding the unique cryptographic keys associated with ownership of blockchain based cryptocurrency. Providing solutions for these basic problems would allow Protego to eventually expand its business to provide a safe and reliable platform for clients to trade and lend cryptocurrency under the scrutiny of U.S. regulators. The operator of a reliable platform providing these services for its clients—on a fiduciary basis, no less—would be at the center of one of the 21st Century's most important emerging economic trends.

30.    After receiving its preliminary approval, Protego sought funding to raise investment capital to build out the bank's infrastructure, obtain final approval from government regulators, and begin operating to the general public as a bank. The importance of raising early capital in a start-up cannot be understated. The first to market advantage is significant in itself, but on a more basic level, the sooner the product comes to market, the sooner investors can begin recouping their initial investments and the company becomes self-sustaining. For these reasons, the selection process for early backers is one of the most crucial decisions that a startup can make.

31.    Protego had garnered significant success in this endeavor prior to its dealings with Blackie. In fact, Protego's earliest investors include many of the largest and most successful companies in the digital asset space, including Coinbase, Ripple, and Digital Currency Group, as well as leading fintech investment firms such as Nyca and Reciprocal Ventures. All told, Protego had raised more than $80 million to advance the business to the point at which Blackie entered the picture.

32.    Blackie and its principals, Nathan Barron and Mark Urbina, were made to understand how important Protego's development would be to the cryptocurrency industry. And, as a result, knew what Protego wanted to hear in order to obtain the exclusive funding

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

opportunity being offered. Blackie's principals signed a non-disclosure agreement regarding Protego on January 13, 2023, and only a few weeks later, after an intense due diligence period, agreed to provide $200 million financing in return for a convertible promissory note. The note provided that Blackie's investment would convert into equity upon the occurrence of a future financing event (or a sale of the company if that occurred prior to a financing event) at a "valuation cap" of $600 million. The "valuation cap" is essentially the negotiated valuation of the company on the day the convertible note is executed, and is established to protect the investor by guaranteeing its investment will convert at no more than the valuation cap, even if future financing occurs at a much larger valuation. The convertible note documents also contained a provision specifying that Blackie's investment would convert into no more than 33% of Protego's total equity. The transaction was intended to close either "on January 30, 2023, the date of this Agreement, or at such other time and place as "Protego and Blackie agreed upon." In any event, the parties discussed the need for haste in delivering the promised funding.

33.     Relying on Blackie's representations that it operated as a family trust with billions of dollars of capital in its sole control, Protego and Blackie reached an agreement on January 30, 2023 (the "Note Purchase Agreement"). The Note Purchase Agreement required Blackie to provide $200 million in financing to Protego in return for a convertible promissory note. The $200 million was initially structured as a loan at the outset, but would convert to an equity stake if and when Protego secured an additional $100 million or more in invested capital from another investor.

34.     The parties entered into the relevant agreements and Protego did everything it was required to do under the Note Purchase Agreement. From the time the investment documents were executed until today, Protego has continued incurring substantial costs with third party vendors as it awaited Blackie's investment. But Blackie continued to insist the investment was forthcoming, and provided documentary support for those assurances, preventing Protego from finding alternative sources of financing.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

35.     Protego selected Blackie from several different companies interested in providing financing because Blackie made specific promises about both its ability to fund the project, as well as the speed with which it would be able to act. In January 2023, Protego executives had several phone calls with Nathan Barron in which he represented that Blackie was well-capitalized and immediately able to fund the transaction.

36.     To backup his representations, on January 24, 2023, Barron sent an email to Protego detailing a precious gem portfolio valued at $3 billion and a valuable real estate portfolio. While Protego had several suitors to choose from, Blackie's insistence that it was well capitalized, combined with its assurances that it had particularized expertise in cryptocurrency related issues, convinced Protego to invite Blackie to invest by entering into the Note Purchase Agreement. (Ex. A.) At this time, Protego had no reason to believe that Blackie would not be able to satisfy the funding requirement established in the Note Purchase Agreement.

37.     When the Note Purchase Agreement was executed, the parties contemplated that the investment transaction would close in a matter of days. This condition had been a specific matter of discussion prior to the Note Purchase Agreement's execution, because it was important for Protego to obtain the resources it needed to build the business, and to meet the financing timeline the OCC imposed as part of its conditional approval of Protego's conversion to a national bank. Blackie represented many times—from its very first meeting with Protego—that it had sufficient capital on-hand to fund the investment in a timely matter. But days slipped into weeks, and weeks slipped into months, and Blackie merely continued to promise that funding was just around the corner. Now, almost two years later, Protego not only continues to await the promised investment, it hasn't received a single communication from Blackie for over five months. Additionally, the OCC has determined that because the financing was not in place when required, Protego's conditional approval has now expired. Blackie's failure to deliver on its obligations caused Protego to lose one of only three national bank charters awarded for digital assets.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

38.     Given Blackie's silence following nearly two years of empty promises, Protego can only conclude that Blackie will not satisfy the obligations imposed by the Note Purchase Agreement. Furthermore, Blackie knew—or should have known—that the parties would have considered it unreasonable at the time they entered into the agreement for Blackie to take two years to satisfy its funding obligations. Protego impressed upon Blackie, at all times during the investment process—both before and after the execution of the Note Purchase Agreement—that it was essential Protego receive the funds in a timely manner in order to satisfy the OCC requirements.

39.     Blackie earned itself significant credibility based on claims that it was funded and backed by the "Blackie Capital Global Family Trust." Based on information and belief, Blackie Capital Global Family Trust has commingled funds with Blackie Capital, exercised ownership and control over Blackie Capital, and as such is responsible for the actions of Blackie Capital. Blackie attempted to submit payment by providing "International Bank Drafts" remitted by Blackie Capital Global Family Trust on behalf of Blackie Capital via The Indigenous Nations Bank ("TiNB"). These bank drafts were uncollectable, but demonstrate the extent to which Blackie Capital, Inc and Blackie Capital Global Family Trust are intermingled.

40.     Protego also chose Blackie after seemingly reputable firms provided information supporting Blackie's ability to meet its funding obligations. Specifically, Protego was provided supporting asset information from Egan-Jones Rating Company and Arthur W. Wood Company. Prior to the close of the Note Purchase Agreement, Egan-Jones Ratings Company rated Blackie's bonds to imply that they were worth billions of dollars, even though those bonds are essentially worthless and cannot support the given rating. Arthur Wood also purported in the course of the parties' discussions to act as the Dealer/Broker on the proposed transaction.

41.     Blackie always insisted that it had the ability to fund the transaction and that a successful funding was always just a few days away. Protego's first experience with this story came immediately after the parties executed the Note Purchase Agreement. In the days following the execution of the contract, Blackie sent Protego a letter stating that it intended to provide the

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

promised funding through a transaction involving DelTec Bank.[3] Very soon after that, it promised an update on the potential for selling Blackie's corporate bonds for liquidity purposes, but claimed that Barron had been "buffeted by the threat of 6 tornadoes" and was thus unavailable to further discuss the transaction. One might expect a delay of a few days if this were the case. Instead, the entire matter was dropped and Blackie returned to square one. And this ended up becoming Blackie's repeating pattern over the first two years: It would promise funding was around the corner, then provide some reason that blocked the funding from proceeding. Then, rather than pick up where the discussion left off, Blackie would move on to some other supposed transaction structure, with different third parties and yet another structure.

42.     By February 2023, Blackie had failed to fund the project even though Mulhall was already conceding that the funding was at a "critical juncture" for providing Protego with the needed liquidity to "keep their doors open." At one point that same month, Mulhall claimed that funding would come in just "two more days." Again, the funding did not come to pass.

43.     Another month passed before Blackie and Protego entered into a follow-up escrow agreement, this time providing that Blackie would deposit the money with an escrow agent retained by Protego for the purpose of facilitating the transaction. Before this transaction was completed, however, Blackie again reported that the transaction had fallen through and stated that it would need to arrange funding through a new intermediary.

44.     By March 2023, the OCC had determined that Protego's conditional approval had lapsed because it had not procured the required funding. The OCC stated "**it was clear Protego met all the requirements of the supplemental letter other than the financing.**" Blackie was aware that this last step was the most material of steps, and was the sole factor preventing Protego from proceeding with its plans.

---

[3] Whether coincidental or otherwise, DelTec Bank has been implicated in numerous criminal investigations, including the FTX collapse and related criminal activity of FTX executives. See, e.g., https://ewnews.com/us-authorities-seize-millions-of-dollars-from-deltec-bank-in-money-laundering-and-fraud-probe/; https://www.justice.gov/usao-cdca/pr/two-foreign-nationals-arrested-laundering-least-73-million-through-shell-companies; https://cryptoslate.com/ftx-secretly-used-deltec-bank-to-create-and-sell-tether-for-profit-lawsuit-alleges.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

45.     At this point, Protego had concerns regarding Blackie's ability to pay, and had already incurred substantial harm, but was assuaged by representations given by both Blackie and third parties that Blackie controlled billions of dollars in assets. Protego assumed that Blackie's problems with funding were technical rather than substantive, and that Blackie still intended to fund the transaction. For its part, Blackie knew that Protego executives were growing impatient. On April 27, 2023, Mulhall sent an email to Protego executives conceding that Protego had already reached "critical thresholds and timelines" and recognized the harm that would result if the project was not funded.

46.     Still, no funding came. For its part, Protego did not just sit back and watch Blackie flounder. To the contrary, it repeatedly demanded through email communications and phone calls that Blackie comply with its contractual obligations, Blackie responded by offering additional reassurances about its ability to satisfy its funding commitments. In June 2023, the law firm of Akerman LLP sent Protego a letter stating that it represented Blackie in regard to the transaction. In doing so, it represented that Blackie was obtaining a corporate bond of one billion Euros as well as a $450 million certificate of deposit. Akerman also claimed that Blackie would "facilitate with the Wertheim Group with regard to the underwriting of a credit facility to be issued to BCI by AWC, which shall be used to finance [Blackie's] Investment in the Company." None of these representations appear to have been true.  The full-throated endorsement of Blackie's ability to fund the transaction by one of the largest law firms in the United States was significant to Protego, who relied on the Akerman endorsement in continuing to wait for Blackie to fund.

47.     In addition to comforting Protego regarding Blackie's ability to fund its obligations, the letter was supposed to be revised and provided to Protego's vendors as comfort that Protego would ultimately receive the funding it had been promised. But as Protego pushed for additional details and assurances as to how and when the funding would come to fruition, Blackie and Akerman demurred, and ultimately failed to describe such a plan.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

48.     Nonetheless, Blackie and Akerman continued to assure Protego that Blackie intended to meet its funding obligations. On August 21, 2023, Blackie again represented that it intended to close on the transaction that week, this time using a transaction from Frost Bank, a Texas-based bank. But again, Blackie only came up with excuses, and again Protego was left waiting. An identical letter on September 18, 2023 was followed by an identical result.

49.     Despite many assurances that Blackie was prepared to close the Protego transaction with Frost Bank as an intermediary, again Blackie called off the transaction more than once, ultimately leaving its funding obligation again unsatisfied.

50.     After pulling the plug on the Frost Bank version of the transaction, Blackie began attempting ever-more complicated and unlikely ways of funding the transaction. In December 2023, for example, Blackie sent communications to Protego claiming that it had sold over $300 million in rare gems to a Florida individual named Daniel Baker. Blackie explained to Protego that based on the transaction, Baker owed Blackie more than $200 million and that Baker would make his payment directly to Protego in satisfaction of the Note Purchase Agreement. Despite Protego's agreement to this arrangement, no payment was forthcoming and, again, the transaction did not close.

51.     After the Baker scenario fell through, Nathan Barron communicated that he was a "diplomat" for the KiKiallus tribe, an allegedly indigenous tribe based in Washington State. Barron communicated that Blackie's new intention was to fund the transaction through TiNB. Barron represented that Blackie managed the "sovereign wealth" of the KiKiallus Tribe, and that the KiKiallus assets would directly fund the closing. But no investment funds were forthcoming from either the KiKiallus or TiNB, and the transaction still did not close.

52.     A month later, on February 21, Protego received another letter from Blackie stating that $200 million would be wired to Protego's bank accounts from Blackie's UBS bank account. The next day, Blackie sent a letter affirming that the money would be delivered on February 23, to which Protego stated that if the money did not come, its "credibility will be destroyed." Per usual, the transfer did not occur. Instead, on March 5, Protego received another

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Blvd. Ste. 550
Irvine, CA 92612
T: 909.557.1250

communication in which Blackie claimed that it could not complete the funding without "completing the API[4] development, installation, and integration work to bring online." Blackie claimed it could not open an account with UBS bank without "completion of the API," which had to be "IBAN compliant."

53.    Blackie continued by stating that it intended to "complete our API development and open the sand box as soon as tonight," which would permit it to "sign and complete the JV which is the last requirement to then officially opening [sic] our account at the Bank." Finally, Blackie claimed that it had moved $250 million in bonds and a $500 million letter of credit to the bank, concluding that it remained "committed to acquiring the outstanding stock" of Protego Holdings Corporation upon successfully converting the note.

54.    API development commonly hits short-term snags to create delays that are measured in days. Indeed, Blackie claimed that it intended to "complete" its API development as soon as that night, open the account, run appropriate tests, and complete funding by the end of the week. Of course, none of this happened. This supposed plan also fell through and the transaction again went unfunded.

55.    More weeks passed with Blackie failing to fund the transaction. And again, rather than complete the transaction, Blackie again defaulted to proffering various alleged proofs of its ability to continue funding the transaction, regardless of whether it actually funded the project or not. Sometime in March, Blackie sent Protego a Note Purchase Agreement between Blackie and an entity called Intrasales Investment Group, providing that Blackie was purchasing bonds with a face value of $2.25 billion, which could then be used to finance the underlying investment transaction. This communication was again intended to support Blackie's ability to fund the Protego transaction.

---

[4] By "API," Protego assumes that Blackie was referencing an "Application Programming Interface," a set of protocols engineered to enable different software components to automatically communicate and transfer data.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

56.    On May 24, 2024, Mulhall sent Blackie a letter admitting that "we failed to convert any of our identified opportunities into liquidity as was forecasted last week, we continue to believe we are close as we have been to transactions that will soon provide us with sufficient liquidity." He claimed that over the "next four to five weeks" Blackie would obtain liquid capital of approximately $1-2 billion. Meanwhile, Mulhall claimed that it had acquired an additional $3 billion of rubies and gold and a $1.75 billion "MTN" (medium-term note) on top of an existing portfolio of over $3 billion. Again, Mulhall claimed under these circumstances that Blackie would raise the "liquidity" necessary to fund the transaction.

57.    After several more weeks passed without further communications about funding, Protego received a short note from a Texas-based accountant named Scherri Scheffer of Sherri R. Scheffer, CPA, PLLC. In her letter, addressed "to whom it may concern," Scheffer assured Protego that Blackie was sufficiently capitalized to complete the transaction.

58.    On June 7, 2024, Blackie Capital provided Protego with a power-point presentation called "Liquidity Update." In that presentation, Blackie stated that "as of today June 7, 2024 our team [] has secured three firm commitments to obtaining the liquidity that has previously eluded our grasp in attempts [sic]."[5] As a result, Blackie claimed that "Time to Market" [sic], meaning the timeline for funding the project—was now "one to two weeks" away. Blackie explained that it also anticipated "smaller sums of cash . . . that should hopefully enable our ability to meet short-term bills and possibly advance smaller amounts of capital until the larger amounts are available." Blackie concluded by stating that it 'regret[ted]' the delay in

_____

[5] Blackie claimed to have secured three separate funding sources: (1) It was selling $3 billion of bonds to One World Bancorp, from which Blackie expected to "clear" $300 million in immediate liquid capital; (2) An agreement with Clear TV to obtain a $1.75 billion secured line of credit against Blackie's less liquid assets, from which Blackie again claimed it expected to clear "more than $300 million"; (3) An acquisition of a facility called Paradise Peak, again expected to earn Blackie $300 million in liquidity. Blackie represented that completing any of these transactions would have sufficiently funded the Protego transaction. But again, no capital payment was forthcoming.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

funding but reiterated that the needed liquidity would be available "within the next one to two weeks."

59.    This was not the case. As in every other case, Blackie reneged on its ongoing commitment and failed to provide any funding at all, much less the $200 million to support the Note Purchase Agreement.

60.    On July 9, 2024, Blackie sent another letter stating that it could "appreciate and understand the absolute dread of receiving yet another Bank Comfort Letter . . . always elusive and always promising liquidity and capital at a future date often contingent upon the execution of a transaction." This time, Blackie claimed that it was receiving approximately $150 million from a "Standby Letter of Credit" agreement entered with an "external Financial Services firm late last week." Of course, Blackie disclosed a full plan for using this "elusive and promising" transaction to satisfy its obligations. Two days later, Blackie sent another Power Point presentation disclosing—for the first time—an alleged capital account held at Tavira Financial, in which Blackie claimed it held approximately $1.7 billion in assets. A separate entry in the presentation suggested that this account had been opened to hold the collateral tied to the line of credit Blackie had supposedly obtained from ClearTV. Concluding the communication, Mulhall claimed that Blackie was "excited to bring this chapter to a close with the wiring of $25 million this week to Protego [] with additional funding to follow next week."

61.    Of course, no funding followed. Instead, Blackie sent a follow-up letter claiming that it could not secure the $150 million because the "firms involved informed us that the second half of the 60,000 British Pounds Sterling fee while received this past Tuesday was not recognized until Wednesday their time in the UK." Blackie claimed that "the result of that delay has contributed to pushing out the date of Blackie Capital receiving the liquidity to Wednesday July 17, 2024, if not sooner." Needless to say, if this transaction was ever completed, the funds were never transferred to Protego. And on July 25, 2024, Mulhall communicated officially that Blackie would not "be able to fund the promised $25 million" to Protego, much less the entire $200 million obligation.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

62.     Approximately six weeks after this breakdown, Protego became aware that Mulhall was leaving Blackie Capital.  At that point, Nathan Barron picked up communication with Protego, including an August 2024 phone call in which he promised to send copies of recent bond sale agreements and an executed letter of direction for the purpose of directing Blackie's counter-party to pay Protego directly with the proceeds.  Again, no transaction took place. Nathan's communication became increasingly sporadic thereafter, and by the end of August 2024, he had also ceased communications with Protego.

63.     Since Nathan Barron ceased communications, there has been no contact from Blackie, despite repeated attempts by Protego to determine whether to the parties will ever be able to proceed with the transaction.

64.     Further investigation into Blackie's representations over the past year reveal various hallmarks and red flags that point to significant intent to defraud.  These same hallmarks and red flags should have put the third parties providing comfort letters and facilitating Blackie's fraud on notice—if they were not on notice already—that the information they were providing was false at worse or questionable at best.

65.     The Defendants were well aware of the damage they were causing to Protego by failing to satisfy their funding obligations. For example, in the context of Protego's relationship with Oracle, which claimed it was owed $15 million for services rendered, Mulhall recognized that if Oracle erased Protego's work product, the cost would be estimated at $25 million in replacement time and labor, an additional year or more of lost time to the market, and a "material erosion of Protego trust value proposition and viability." This latter point was all the more important given that Protego's entire proposal rested on being an institution of trust for storing and managing cryptocurrency accounts.

66.     In the absence of ongoing communication about the funding, Protego finally grew tired of Blackie's dissembling and demanded that Blackie fulfill its obligations or Protego would file this lawsuit. After several more weeks, Protego sent a follow-up letter demanding that Blackie preserve its documents in light of the impending litigation. Since Protego sent these

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

communications, Blackie has not communicated with Protego at all. There has been no indication at all in that timeframe that Blackie intends to satisfy its obligations under the Note Purchase Agreement. As such, Protego assumes that Blackie no longer intends to satisfy its obligation under the Note Purchase Agreement, if it ever did. Indeed, Blackie appears never to have intended to satisfy its obligations under the Note Purchase Agreement at all, and induced Protego's agreement only to profit from Blackie's own frauds.

## <u>COUNT I</u>

### BREACH OF CONTRACT

### (Based on Washington Law Against Blackie Capital)

67.     Protego incorporates Paragraphs 1 through 66, inclusive, as though set forth in full herein.

68.     As alleged above, Protego and Blackie entered into the Note Purchase Agreement, which controls the terms of the transaction between the parties.

69.     The Note Purchase Agreement is enforceable, in that all material terms necessary for the enforcement of the contract are included in the document.

70.     The transaction calls for each party to receive valuable consideration in return for entering into the agreement: Protego is intended to receive $200 million in investment capital, while Blackie receives the Convertible Promissory Note, which provides that Blackie will receive equity in Protego in an amount equal to the amount of the loan, which shall not exceed 33% of the total equity of the company, and if the note converts at maturity, 25% of the total equity of the company.

71.     Protego has fulfilled all obligations under the Note Purchase Agreement, including its readiness and willingness to provide the Convertible Promissory Note to Blackie at the time of closing.

72.     Blackie has failed to provide the $200 million funding obligation provided for under the Note Purchase Agreement, which was due on the date the parties executed the document. Blackie has had nearly two years to perform on commitments that it has regularly represented it has sufficient funds to complete. Furthermore, the parties  were aware that time

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

was of the essence when they executed the Note Purchase Agreement, given market circumstances and the need for Protego to act quickly to take advantage of its regulatory approval.

73.     Despite Protego's continuing attempts to engage Blackie and complete the transaction, Blackie has not communicated with Protego in several months. To the extent that Blackie's failures to perform within a reasonable amount of time do not constitute a breach, Blackie's failure to cooperate with Protego to schedule a closing date constitutes an anticipatory repudiation of the contract for which Protego is entitled to restitution and damages.

74.     Blackie breached the Note Purchase Agreement by actively engaging in a fraudulent scheme to evade its funding responsibilities as set forth in that agreement. At a minimum, Blackie has breached the following provisions of the Note Agreement:

   a.   Blackie has breached Section 1.1 of the Note Purchase Agreement by failing to purchase the Convertible Promissory Note from Protego, despite its agreement to do so;

   b.   Blackie has breached Section 2.1 of the Note Purchase Agreement by failing to reasonably schedule the Initial Closing, or to provide the "duly counter-executed note" or "payment in full for the Note," either in the form of a check or wire transfer of funds. Protego has been continually ready and willing to provide a duly executed Note at closing in return for Blackie's satisfaction of the terms of the Note Purchase Agreement.

   c.   Blackie has breached Section 4.1 of the Note Purchase Agreement, by misrepresenting its authorization to enter into the Note Purchase Agreement, and/or that it had full power and authority to enter into the Note Purchase Agreement.

   d.   Blackie has breached Section 4.2 of the Note Purchase Agreement because it did not intend to acquire the investment for its own account, but as a pretext for some unknown nominee or agent to acquire.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

e.  Blackie has breached Section 5.2(b) of the Note Purchase Agreement by failing to perform and comply with its agreements, obligations, and conditions as described therein, and because it has failed to obtain all "approvals, consents, and qualifications necessary to complete the purchase and sale" described by the Note Purchase Agreement.

f.  Blackie has breached Section 6.12 of the Note Purchase Agreement by failing to "execute and deliver such instruments, documents or other writings as may be reasonably necessary or desirable to confirm and carry out and to effectuate fully the intent and purposes of this Agreement."

75.  The covenant of good faith and fair dealing requires that parties to a contract act with fairness and good faith toward the other parties, and that the parties not take any action that would defeat the purposes of the agreement. The covenant of good faith and fair dealing further requires the parties to refrain from acts or omissions related to their agreement that may cause monetary damage to each other. By failing to carry out the purposes of the contract, Blackie has breached this covenant of good faith and fair dealing.

76.  Protego alleges that in doing the acts and omissions set forth above, Blackie never intended to comply with the terms and conditions of the 2012 Operating Agreement and business partnership in the company.

77.  Protego further alleges that Blackie Capital operated as the alter ego of the individual Defendants and affiliated entities, including but not limited to Blackie Capital Global Family Trust, and that corporate formalities were ignored, assets were commingled, and control was exercised to such an extent that Blackie Capital had no separate mind, will, or existence of its own. The use of the corporate form was a mere sham intended to perpetuate a fraud, avoid contractual obligations, and unjustly shield the individual Defendants and their affiliated entities from liability. As such, each of the Defendants who acted in concert with Blackie Capital should be held jointly and severally liable for the breaches of contract described herein.

78.  As a direct and proximate result of Blackie's breach of the Note Purchase Agreement, Protego has suffered damages in an amount to be proven at trial. In addition, and

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

among other things, Protego has been damaged in the form of costs undertaken in reliance on Blackie's contractual commitment, the decrease of the value of Protego's ownership interests in the company resulting from the breach, and causing an adverse effect on Plaintiff's financial condition.

<u>**COUNT II**</u>

**FRAUD IN THE INDUCEMENT**

**(Based on Washington Law Against Blackie Capital, Blackie Capital Global Family Trust, Mark Urbina, Nathan Barron, Michael Mulhall, Michael Barron, Theresa Barron, Yoseph Elkaim)**

79. Protego incorporates Paragraphs 1 through 77, inclusive, as though set forth in full herein.

80. As an alternative cause of action to the breach of contract cause of action, depending on the outcome of discovery, Protego alleges that various individuals, including, but not limited to, Nathan Barron, Michael Mulhall, Michael Barron, Theresa Barron, Yoseph Elkaim, and Does 1-10, formed Blackie with the express intent of using the entity as a vehicle for fraudulent actions. Protego further alleges that Blackie's finances, to the extent it has any at all, are intermingled with the personal fortunes of the other Defendants, including the Blackie Family Trust. Defendants freely move these assets among various entities (including Doe entities) to avoid contractual obligations and judgments. As such, Protego alleges that (1) each of the Defendants acts as an alter ego or agent as to each other and (2) that Defendants engaged in a conspiracy to create the Blackie Capital entity as a vehicle for their fraudulent purposes, and thus each Defendant should be liable for the damages caused by the fraud.

81. Blackie intentionally submitted information to Protego prior to entering into the Note Purchase Agreement, with the purpose of inducing Protego to enter into the Note Purchase Agreement with Blackie instead of others interested in the opportunity. Blackie made specific

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

representations about its assets on hand, the value of those assets, and its ability to leverage those assets (many of which were non-existent, in any event) to satisfy its obligations as an investor.

82.     Blackie's statements were material to Protego. Prior to entering into the Note Purchase Agreement, Protego had received interest from several investors. The two most important factors to Protego in obtaining financing were (1) the amount of assets the investor could invest in Protego and (2) the speed with which the investor could act to fund the obligation. Time was of the essence because Protego was incurring millions of dollars in labor and technology costs building out the necessary environment and platforms to operate the planned bank. Protego's decision to enter into an investment agreement with Blackie was based largely on Blackie's representations that it had sufficient capital to immediately fund its investment obligations. Had Protego known the true state of Blackie's assets, it would not have entered into the Note Purchase Agreement with Blackie, but instead would have chosen another investor.

83.     Blackie's statements were false. In appears now likely that Blackie was not in possession of the assets it claimed, nor did it control those assets. As such, it was not in a position to leverage non-existent assets into liquidity for the investment. Nor did Blackie have any of the industry or financial contacts it represented it would be able to rely on to obtain liquidity.

84.      Blackie knew, or should have known, that the representations it made to Protego were materially false. It knew that it did not have the assets it represented, and further knew that it did not have the relationships in the financial industry that would permit it to raise the assets necessary. To the contrary, Blackie invented its assets and connections for the sole purpose of entering into the Note Purchase Agreement, which would then permit Blackie to use Protego for the purpose of raising assets for its own use.

85.     Blackie knew that Protego would rely on Blackie's false representations as to its assets and other factors related to the transaction. Blackie further knew that Protego was not aware of the falsity of the representations being made, and that Protego would not have entered into the Note Purchase Agreement had Blackie accurately disclosed its assets and its ability (or

23

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

lack thereof) to obtain the necessary resources. Perhaps the most important factor in selecting an initial investor is the investor's capacity to satisfy its obligations, even in market-adverse or surprise conditions.

86.    The facilitating Defendants knew or should have known that their representations about assets held by Blackie was not reliable

87.    Protego justifiably relied upon Blackie's representations and the facilitating Defendants as to its assets because Blackie made various specific representations regarding both the size and availability of its assets to complete the underlying transaction. Protego sent documents and made specific representations about both its assets and its relationships with various financial entities and individuals who would be able to facilitate the transaction contemplated by the Note Purchase Agreement. Protego had no reason to disbelieve or discount these representations.

88.    Protego further justifiably relied upon the representations as to income because of the common law duties Blackie owed to provide Protego with accurate information prior to entering into the Agreement. In particular, Blackie and the facilitating companies had superior knowledge of the amount and availability of its assets, and had a duty to accurately disclose those facts to Protego because it knew those facts would be material to Protego entering into the action.

89.    Based on Blackie's materially false statements, Protego reasonably entered into the Note Purchase Agreement.

90.    As a direct and proximate result of Blackie's wrongful conduct, Protego was defrauded and deceived, and therefore has suffered damages in an amount to be calculated at trial.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

## COUNT III

**FRAUDULENT MISREPRESENTATION**

**(Based on Washington Law Against Akerman LLP, Sherri Scheffer, and Sherri R. Scheffer, CPA, PLLC, Egan-Jones Rating Company, Arthur W. Wood Company)**

91.     Protego incorporates Paragraphs 1 through 89, inclusive, as though set forth in full herein.

92.     On May 10, 2024, Defendant Sheri Scheffer and Sherri R. Scheffer, CPA, PLLC sent a letter to "whom it may concern" representing that Blackie had "sufficient assets" to close the transaction. Scheffer represented that Blackie had assets under management of approximately $3.75 billion.

93.     Scheffer apparently did no diligence before making these representations, and instead made these representations negligently or recklessly, without a good faith basis for the representations made.

94.     Scheffer knew, or should have known, that Protego would rely on her misrepresentations.

95.     Protego relied on Sheri Scheffer and Sherri R. Scheffer, CPA, PLLC's representation regarding Blackie's assets under management by continuing to incur costs and delays in developing Protego's banking platform. Protego also forewent seeking additional (or different) sources of new capital based on Scheffer's representations.

96.     Protego's reliance on Scheffer's representation was reasonable, and Scheffer's representations were negligent because she failed to take reasonable steps to confirm the truth of her statements.

97.     In 2023, Defendant Akerman LLP sent a letter to Protego representing that Blackie had ample assets to close the transaction. Scheffer represented that Blackie had assets under management of approximately $3.75 billion.

98.     Akerman is one of the largest law firms in the United States, and the information it provided was of particular comfort to Protego at a significant time. The Akerman Law firm

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

knew or should have known that Protego would rely on its representations about the assets, and that Protego did, in fact, rely on the assets, all to their detriment.

99.     Akerman LLP did inadequate diligence before making these representations, and instead made these representations negligently or recklessly, without a good faith basis for the representations made. Additionally, many of the statements made by Ackerman and its representatives in connection with the transaction were knowingly false or, at a minimum, made with reckless disregard for the truth.

100.    Defendants Egan-Jones Rating Company and Arthur R. Wood Company make representations regarding the amount and quality of assets held by Blackie that was used by Blackie to entice Plaintiff to enter into a financing contract with Blackie.

101.    Defendants' statements were knowingly false, or made recklessly without knowledge of the truth of the statement. Upon information and belief, Defendants' representations were made in an effort to mislead Protego regarding the assets held by Blackie Capital, and provide additional support for Blackie's own misrepresentations. As a result of these misrepresentations, Protego maintained its reliance on Blackie's promises to make payments it did not have funds to pay, and had no intention of making.

102.    Defendants intended that their misrepresentations should be acted upon by Protego. Protego reasonably and justifiably relied on Defendants' representations by waiting for Blackie to fund its obligations, despite Blackie's failure to do so under the terms of the contracts.

103.    Protego did not know of the falsity of the Defendants' misrepresentations. Had Defendants informed Protego of the truth—that Blackie Capital did not have sufficient capital to fund the Note Purchase Agreement—Protego would not have acted in reliance on Blackie Capital's promises to pay. As a material and direct result of Defendants' misrepresentations, Protego bypassed months, if not years, of opportunities to extract itself from the breached contract with Blackie and find alternative funding opportunities for its business .

104.    As a result of Defendants' representations, Protego suffered damages in an amount to be determined in the litigation.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

## COUNT IV

## APPOINTMENT OF A RECEIVER

105.    Protego incorporates Paragraphs 1 through 103, inclusive, as though set forth in full herein.

106.    The circumstances present a danger of loss, waste, material injury, or impairment of the Property as damages for failure to satisfy the terms of the Note Purchase Agreement as provided herein. Furthermore, Blackie has engaged in a pattern of practice of deception of fraud, with the concurrent concern that it will move or transfer assets to foreign accounts or to other uncollectible circumstances. The appointment of a receiver is necessary to conserve and protect the Property.

107.    Plaintiff is entitled, pursuant to RCW 7.60.025, and Federal Rule of Civil Procedure 64, to the appointment of a general receiver to take possession of, preserve, protect, conserve, and manage the Property pending a disposition of the Property at sale, and to perform such other acts as the Court may approve.

## COUNT V

## NEGLIGENT MISREPRESENTATION

**(Based on Washington Law Against Blackie Capital, Blackie Capital Global Family Trust, Akerman LLP, Sherri Scheffer, Sherri R. Scheffer, CPA, PLLC, Egan-Jones Rating Company, Arthur W. Wood Company)**

108.    Protego incorporates Paragraphs 1 through 107, inclusive, as though set forth in full herein.

109.    Defendants, and each of them, made representations to Protego regarding Blackie Capital's financial condition, its ability to fund the Note Purchase Agreement, and its access to assets that would support the investment.

110.    Defendants made these representations without reasonable grounds for believing them to be true, and without conducting adequate diligence to verify the accuracy of the information provided.

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

111.    At the time the representations were made, Defendants should have known that the information was either false or could not be verified, and that Protego would rely on such information in deciding to enter into the Note Purchase Agreement and forgo other investment opportunities.

112.    Protego justifiably and reasonably relied on the representations made by Defendants, and took action based upon that reliance, including entering into the Note Purchase Agreement, incurring substantial expenses, and foregoing alternative sources of capital.

113.    As a direct and proximate result of Defendants' negligent misrepresentations, Protego has sustained damages in an amount to be determined at trial.

114.    Protego seeks compensatory damages, costs of suit, and any other relief the Court deems just and proper.

## **JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

a.    for contract damages;

b.    for specific performance;

c.    for consequential damages;

d.    for actual damages;

e.    for exemplary damages resulting from Defendants' fraud and misrepresentations;

f.    for pre-judgment and post-judgment interest as provided by law;

g.    for attorneys' fees and costs; and

h.    for such other relief as the Court deems just and proper.

///

///

///

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250

1    DATED: March 26, 2025      Respectfully submitted,

2

3                          *s/ Ari Y. Brown*

4                          Ari Y. Brown, WSBA #29570
Law Offices of Ari Brown, PLLC

5                          3909 47th Avenue South
Seattle, WA 98118

6                          (206) 412-9320

7                          abrownesq@gmail.com

8                          **MCCUNE LAW GROUP**
Richard D. McCune*

9                          California State Bar No.132124
Email: rdm@mccunelawgroup.com

10                        Michele M. Vercoski*
California State Bar No. 244010

11                        Email: mmv@mccunelawgroup.com
Yasmin N. Younessi*

12                        California State Bar No. 331327
Email: ynv@mccunelawgroup.com

13                        MCCUNE LAW GROUP

14                        18565 Jamboree Road, Suite 550
Irvine, CA 92612

15                        P: 909.557.1258|
McCuneWright.com

16

17                        *Attorneys for Plaintiff*

18                        **Pro Hac Vice* Application to be Submitted

19

20

21

22

23

24

25

26

27

COMPLAINT
CASE NO.

Law Offices of Ari Brown, PLLC
3909 47th Avenue South
Seattle, WA 98118
T: 206. 412.9320

MCCUNE LAW GROUP
18565 Jamboree Road, Ste. 550
Irvine, CA 92612
T: 909.557.1250